**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | | |
|---|---|---|
| COLLEEN HAYES, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:05-CV-102-JOF |
| CITY OF NEWNAN, GEORGIA, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

**OPINION AND ORDER**

This matter is before the court on Defendants' motion for summary judgment [20-1];

the Report and Recommendation of Magistrate Judge Alan J. Baverman [59-1]; and

Plaintiff's objections thereto [61-1].

**I.     Background**

**A.     Facts**

On October 12, 2005, Plaintiff, Colleen Hayes, filed a complaint against the City of

Newnan; Larry Keith Brady, the Mayor of Newnan; C. Bradford Sears, the City Attorney;

and the six members of Newnan's City Council at the time of Plaintiff's termination:

George Alexander, George Bradshaw, John Goodrum, Cynthia Jenkins, Sidney Pope Jones,

and Gregory Lewis.  Plaintiff raised a variety of causes of action related to her employment,

however, at the summary judgment stage, she abandoned all but two claims:  (1) retaliation for opposing gender discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* and (2) retaliation in violation of the First Amendment of the U.S. Constitution, 42 U.S.C. § 1983.

The court summarizes the facts as found by the Magistrate Judge.  The City of Newnan has a Mayor and a six-member City Council.  The City has a city manager and eight or nine department heads.  The Mayor and the Council set the policy for the city, and the city manager runs the day-to-day operations of the City, recommends policies to the Council, and enforces City ordinances.  The city manager and department heads have the authority to hire and retain employees.  The Council supervises, hires, and terminates the city managers and may recommend the termination of other employees.

Plaintiff started working for the City in November 1999 as its first Human Resources director.  Plaintiff's supervisor was the city manager.  When Plaintiff was hired, Richard Bolin was the city manager.  Bolin retired in December 31, 2001 and was replaced with Danny Lewis in February 2002.

At some point in 2000, Plaintiff had an altercation with Jerry Phillips, a police officer.  Phillips alleged that Plaintiff touched him inappropriately.  Plaintiff contended that Phillips told other officers not to speak to her because she worked for personnel and was the enemy.  Plaintiff also asserted that when she moved Phillips' jacket to see his name tag,

Phillips struck Plaintiff violently.  While Bolin did not report this incident to the Council, at least two members of the Council were aware of it.  Plaintiff avers that the Council voted to give Phillips a pay raise after this, but not make it retroactive, in order to send a message to Phillips.

In the middle of 2001, Plaintiff began a romantic relationship with the then-Chief of Police, Ronny Williams.  The Mayor was aware of this relationship and told Bolin about it.  Bolin testified that when he asked Plaintiff about the relationship, she lied to him.  Bolin told the Mayor that he believed Plaintiff lied to him (Bolin).  Plaintiff stated that she tried to tell Bolin about it, but he interrupted her and told her that her personal life was none of his business.

Around this time, Brenda Washington's daughter, an employee of the police department, brought a sexual harassment lawsuit against the Police Chief.  In June 2001, Plaintiff called Washington and stated:  "So I'm a whore, a yard dog.  And I give blow jobs in the parking lot.  When this is over and done with, everyone is going to know what this is all about, and everyone is going to see you for what you are."  Washington wrote a letter to City Council, the Mayor, and the City Manager, complaining about Plaintiff's behavior. Washington asserted that Plaintiff threatened to post on the internet a picture of Washington "in all [her] glory" if Washington's daughter did not drop the investigation.  Plaintiff denies making the comments about dropping the investigation.

3

In March 2002, Karen Bowen wrote a letter to the Mayor and City Council complaining about Plaintiff's rude behavior. She wrote that she saw Plaintiff "issue a blistering reprimand" to the receptionist, and she was treated disrespectfully by Plaintiff. Plaintiff denies engaging in this behavior. Plaintiff testified that Lewis told her not to worry about the letter because he was present at the meeting. The Mayor was aware of the contents of the letter but took no action. Lewis also did not take any action.

At an unspecified time, a firefighter complained to Councilman Alexander that Plaintiff acted inappropriately when interviewing the firefighter for a fire department investigation. The firefighter contended that Plaintiff had turned off the tape recorder and yelled at the fireman before turning the tape back on. Plaintiff denied this incident.

In December 2003, Katrina Cline, a department head for the City of Newnan, complained to Plaintiff about Lewis. Plaintiff took Cline to the City Attorney, Brad Sears, where Cline filed a complaint. Plaintiff told Sears that Lewis was making comments detrimental to the Council and the City. She asked Sears how to handle the Cline investigation because Lewis was Plaintiff's supervisor. Plaintiff and Cline discussed Lewis' management style with Sears. It is not clear whether Plaintiff contended that Lewis' problems were gender-related.

AO 72A
(Rev.8/82)

Four months later, Cline filed a formal grievance against Lewis, and Plaintiff supported Cline in that effort. Plaintiff forwarded her own draft of a grievance against Lewis but never formally filed it because she believed the situation would be handled.

Cline appealed her grievance to the Council. The Council hired attorney Harvey Gray to conduct an independent investigation into the grievance. According to Gray, Cline's grievance was: "Cline believes that Mr. Lewis erroneously formed the opinion that Ms. Cline, Ms. Hayes, and Ms. Bridges were participants in a conspiracy to discredit him or otherwise cause his dismissal." Cline contended that Lewis then retaliated against the three. Gray interviewed numerous witnesses during his investigation, including Plaintiff. During her interview with Gray, Plaintiff stated that she believed Lewis unlawfully discriminated against females. Plaintiff stated that at first, she believed the issue involved general management issues, but over time, she became convinced that Lewis treated women differently.

Gray drafted a report – termed in this litigation the "Gray Report." Gray concluded that Lewis was not discriminating on the basis of gender, but rather because he believed Cline was out to get him. Gray did determine that Lewis had management style problems. He reported that other than Ms. Cline, Ms. Hayes, Ms. Bridges, and Cliff Foster, no one else believed that Lewis treatment women differently. Gray reported his findings to Council on September 14, 2004. At that time, he stated there were problems with Lewis' management

5

style, but Lewis was not the entire problem.  He did not make any recommendations as to whether Lewis should be retained.  Gray did not make any negative comments about Plaintiff.

At the October 12, 2004, Council meeting, Council decided to offer Lewis the opportunity to resign in exchange for severance.  If he did not resign, he would be fired.  Council also discussed other people that would need to be terminated in order to fix the management problems.  Plaintiff's name was discussed, as well as Cline's and Bridges-Kee's.  Council voted to make the same offer to Plaintiff that had been made to Lewis.

The Report and Recommendation carefully documents the testimony provided by each Defendant as to why he or she made the decision to terminate Plaintiff.  Due to the nature of Plaintiff's pretext arguments, the court believes it important to recite this testimony in toto.  As the Report and Recommendation noted:

> Councilman Lewis decided to terminate Plaintiff based on things that he heard about her, including her attitude and her handling of employee situations.  He stated that individuals reported the following about Plaintiff: (1) they could hear her raising her voice at employees when they would ask questions; (2) Plaintiff would not respond to questions; and (3) her attitude seemed like she did not want to help people.  (Lewis Dep. at 58-59).  Lewis assumed that these reports were reliable because they came from multiple sources.  (*Id.* at 61).
>
> Councilman Bradshaw indicated that the Council became aware of Plaintiff's management style during the years, and that he did not believe the rumors about Plaintiff were false because they perpetuated for four or five years.  (Bradshaw Dep. at 83).  After Plaintiff's relationship with the prior Police Commissioner, Bradshaw believed that individuals in the police

6

department distrusted her and did not want to see her. (*Id.* at 93).  Bradshaw believed that Plaintiff was no longer effective in performing her job based on people not wanting to talk to her about their salary, benefits, or other concerns. (*Id.* at 99).

Councilman Goodrum stated that had he attended the October 12 meeting, he would have terminated Plaintiff because the operations of the City were off track and there were innuendoes concerning Plaintiff's outside social life, *i.e.*, her relationship with the former police chief, her attempt to discredit one of the chief's former girlfriends, and her denial about going on a trip with Williams.  He believed that these incidents interfered with the confidence of city employees.  Also, he stated that he did not want to have the new City Manager deal with the situation.  (Goodrum Dep. at 72-73).

Councilman Alexander indicated that a number of council members spoke about Hayes, including that she had poor relations with employees, she was mean, and she was unapproachable. (Alexander Dep. at 50).  Alexander added to this discussion that Plaintiff had poor relations with employees, Plaintiff was unapproachable, employees were scared of her, and Plaintiff was rude to employees and citizens. (*Id.* at 50, 71, 83).  Alexander believed that Plaintiff had poor relations with employees based on multiple employees approaching him about Plaintiff around the time of the Gray report. (*Id.* at 51, 55).  Alexander also informed the Council that employees were afraid of Plaintiff, and employees believed that Plaintiff was mean and unapproachable. (Alexander Dep. at 71).

Councilwoman Jenkins indicated that she heard from several employees that Plaintiff was mean.  (Jenkins Dep. at 49-59).  Jenkins informed the Council that employees were having problems with Plaintiff. (*Id.* at 49).  When Jenkins brought this information up to individual council members or to the Council, she was then informed about the Williams situation. (*Id.* at 60-61).  Jenkins had individual discussions about Hayes after the Gray report. (*Id.* at 62-63).  Jenkins also was informed about an incident where Hayes turned off a tape recorder to yell at fireman while she was interviewing him. (*Id.* at 73-74).  Council members also informed Jenkins about a letter from someone who had a bad experience with Hayes. (*Id.* at 77-78).  The Mayor also indicated that he heard Plaintiff yelling at someone on the phone in his office. (*Id.* at 78-79).  As a result of this information, Jenkins

7

believed that there was a great amount of tension in the office and problems in other departments with Plaintiff, which the Council needed to resolve. (*Id.* at 89-90, 93-94).

Councilman Jones stated that the Council discussed whether to fire Plaintiff for 30 to 45 minutes. (Jones Dep. at 59-60). He indicated that they discussed a situation with the former chief of police, a citizen complaint, and employee complaints about Plaintiff's treatment. (*Id.* at 60-61). The cumulative information played a role in Jones's decision that Hayes should be fired. (*Id.* at 63, 68-69). These reasons were based on other council members' reports. (*Id.* at 70-71).

Mayor Brady stated that Plaintiff was fired because there was an erosion of confidence of council members concerning her role as HR director. (Brady Dep. at 91). The Council decided to fire her because it did not want to put the next City Manager in a position of firing department heads. (*Id.* at 92-93). Brady thought that it was acceptable to terminate Plaintiff for old events because Plaintiff's termination was a result of actions that had built up over time. (*Id.* at 96-97). Brady was persuaded to fire Plaintiff because of a citizen complaint letter, his personally hearing Plaintiff yelling and screaming at employees on more than one occasion, Plaintiff's phone call to the police chief's former girlfriend, and Plaintiff's lying about her trip to Savannah with the former police chief. (*Id.* at 98-100, 106-09).

*See* Report, at 12-14 n.7. In sum, the court notes that each Council member referred to Plaintiff's attitude with employees and other individuals in contact with the City, as well as Plaintiff's relationship with the police chief and employees' distrust of Plaintiff arising therefrom. The Council members also noted that the Gray Report indicated a general lack of trust and confidence in the city's government. The Mayor and several Council members specifically testified that they felt they had to terminate Plaintiff themselves because they

were bringing in a new city manager and did not want him or her to have to deal with potentially terminating a department head as one of his or her first tasks.

Prior to the October 12, 2004 meeting, Council never discussed terminating Plaintiff. Plaintiff had not been counseled for inappropriate behavior, nor had the city manager indicated that her job was in jeopardy. Sears was present at the October 12, 2004 meeting in his capacity as city attorney. He did not recommend that Plaintiff be removed or terminated. When asked whether there was any reason Council could not fire Plaintiff, Sears stated that Plaintiff was an at-will employee who could be terminated for any reason so long as it did not violate federal or state law.

On October 13, 2004, Sears met with Lewis and Plaintiff individually. Lewis accepted his severance package. Plaintiff did not accept hers when she learned that Lewis had been offered six months' severance while she had only been offered three. Although the severance agreement indicated that Plaintiff was to have 21 days to consider the offer, Plaintiff was terminated before the expiration of 21 days. Rather, Plaintiff was given 30 to 45 minutes to consider the offer. Sears told Plaintiff she was being terminated because Council had lost confidence in her and her ability to do her job. Plaintiff's separation notice indicates that she was terminated for declining to accept severance pay instead of termination.

**B.      Report and Recommendation of the Magistrate Judge**

The Magistrate Judge first determined that Defendant Sears, the City Attorney, could not be liable to Plaintiff under § 1983 because he was not the official decision-maker on her termination.  *See* Report, at 22-24.  On Plaintiff's Title VII retaliation claim for her own complaint against Lewis and for her support of Cline's complaint against Lewis, the Magistrate Judge found that Plaintiff could establish a prima facie case of retaliation.  *See id.*, at 24-36.  No party makes objections to these findings, and the court accepts them.

The Magistrate Judge then noted that Defendants presented legitimate, non-discriminatory reasons for terminating Plaintiff:  (1) Council members received complaints from Plaintiff's co-workers, subordinates, and citizens about Plaintiff's behavior, (2) Plaintiff lied to her supervisor about spending a weekend with the former police chief, and (3) Plaintiff's relationship with the police chief made employees, especially police officers, reluctant to seek assistance from Human Resources.  Further, Defendants show that three other employees who supported Cline's grievance were not fired, making it difficult for Plaintiff to establish that Defendants' offered reasons for termination were pretextual.

Plaintiff argues these reasons are pretextual because many of them occurred several years before her termination – the March 2002 Bowen letter, the allegations about turning off the tape recorder, and the touching incident involving Jerry Phillips in 2000.  Plaintiff states that had these been viable reasons for termination, Plaintiff would have been

10

disciplined at the time the incidents occurred and prior to her termination.  Plaintiff also pointed out that the complaints that she was rude were supported only by limited evidence, and it was unsurprising as head of Human Resources that some employees would be unhappy with her.  Plaintiff avers that Defendants' proffered reasons should not be believed because Defendants responded in interrogatories that Jackie Holt and Renee Windom had complained about Plaintiff, but Holt and Windom then testified that they had a good relationship with Plaintiff.  Finally, Plaintiff argues that Defendants provided shifting reasons for her termination because they never contended to the EEOC that Plaintiff had engaged in misconduct.

The Magistrate Judge considered each of Plaintiff's arguments in turn.  The Magistrate Judge found that while some of the incidents discussed by Defendants were remote in time, they were not the only bases for firing Plaintiff.  The Magistrate Judge also noted the unique circumstances surrounding Plaintiff's termination in that the city manager was usually charged with the authority of terminating department heads, such as Plaintiff.  As such, Council never had the opportunity to intervene in Plaintiff's employment.  However, at the October 12, 2004 Council meeting when it became clear that Council was terminating the city manager, the possibility of taking other actions to control the management problem in the city government also came to light.  Plaintiff had not provided any evidence to show that the unusual circumstances here were the result of her protected

11

activity as opposed to the cumulation of circumstances concerning a tension-filled office. The fact that Plaintiff received her normal pay raises and had not previously been disciplined also could not be evidence of pretext, the Magistrate Judge noted, because Plaintiff's supervisor – the city manager – had not made the decision to terminate Plaintiff, the Council did. Finally, although Plaintiff denied that she was rude and unapproachable to citizens and employees, she did not provide any evidence to show that Council did not have a reasonable belief that she was rude and unapproachable based on the complaints made to Council. *See id.* at 39-46.

The Magistrate Judge rejected Plaintiff's argument that because two employees Defendants had identified as having problems with Plaintiff – Jackie Holt and Renee Windom – did not actually complain about Plaintiff, then Defendants' reasons for termination were pretextual. As the Magistrate Judge noted, Council members testified about numerous complaints raised by employees and citizens. Council did not rely only on their belief that Holt and Windom had problems. *Id.* at 47-48.

The Magistrate Judge also determined that Defendants had not offered shifting reasons for Plaintiff's termination. In response to the EEOC investigation, Defendants stated that Plaintiff was terminated after she declined a severance agreement and because Council believed it was "in the best interest of the City" to change the department head for

Human Resources. The "best interest" formulation is not inconsistent with Defendants' later elaboration that Plaintiff's management style was causing complaints. *Id.* at 48-50.

Finally, the Magistrate Judge found that Defendants' error in listing Holt and Windom in the interrogatory response was not evidence of pretext, although it was clearly wrong. Holt had never complained to anyone. Windom, however, while not complaining directly to City Hall apparently did complain to another employee about Plaintiff, and that employee may have passed her complaints along to the city leaders. The other individuals listed did, in fact, complain about Plaintiff. *Id.* at 50-51. Because she could "not identify any evidence to suggest that these reasons were a pretext for retaliation," the Magistrate Judge recommended that Defendants' motion for summary judgment be granted.

The Magistrate Judge then turned to Plaintiff's First Amendment retaliation claim. Because Defendants initially briefed this claim under the *McDonnell-Douglas* framework, the Magistrate Judge directed the parties to re-brief the issue under the appropriate *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977), precedent. The Magistrate Judge considered Defendants' arguments that Plaintiff's speech was not a matter of public concern under *Mt. Healthy* and even if it were, Defendants were entitled to qualified immunity. During the briefing on summary judgment, Plaintiff conceded that her December 2003 meeting with Sears and her own internal grievance of discrimination did not address matters of public concern and therefore could not form the basis of a § 1983 First

13

Amendment retaliation claim.  Therefore, the Magistrate Judge limited his discussion to Plaintiff's speech in relation to the Gray Report and the Gray investigation.  *Id.* at 52-60.

The Magistrate Judge recognized that Plaintiff's support of Cline's complaint of discrimination did touch upon a matter of public interest, but the form, content, and context of the speech showed that Plaintiff was not speaking as a citizen but rather as an employee. Plaintiff's support for Cline's grievance is related to her own complaints about Lewis. Plaintiff's support for Cline would also benefit Plaintiff's own work environment because Plaintiff had troubles with Lewis as well.  Because Plaintiff was the human resources representative for the City, employee disputes were relevant to her employment, although not officially part of her job duties.  As part of the Gray report, Plaintiff sat in on discussions with Gray and Sears and provided input on strategy.  Plaintiff's opinions on the Lewis matter were always given in non-public settings.  *Id.* at 60-63.

The Magistrate Judge then distinguished the precedent offered by Plaintiff to support her position, noting that in *Tindal v. Montgomery County Comm'n*, 32 F.3d 1535 (11th Cir. 1994), the plaintiff was another employee of the sheriff's department who participated in a co-worker's federal discrimination complaint and testified in court as a witness for the co-worker.  The Eleventh Circuit held the plaintiff's speech was public because it was made in public in court proceedings and involved another employee's lawsuit such that the plaintiff's speech was not motivated by self-interest.  Here, there is no public setting and Plaintiff's

14

participation in the speech related both to her role as head of human resources and as an employee who was also supervised by Lewis and having problems with him. *Id.* at 62-65.

In the alternative, even if Plaintiff's speech was a matter of public concern, the Magistrate Judge also concluded that Plaintiff could not establish causation for the same reasons she could not demonstrate pretext in her Title VII claim. *Id.* at 65-68. The Magistrate Judge notes in his Report and Recommendation that with respect to the *Mt. Healthy* framework, Defendants only addressed whether Plaintiff's speech was a matter of public concern. Because of this, Plaintiff argued that she did not have an obligation to address other elements of the *Mt. Healthy* standard. The Magistrate Judge determined that he could address this issue *sua sponte* because he gave notice to the parties when he directed Defendants "to address whether the individual Defendants and the City of Newnan are entitled to summary judgment on the First Amendment retaliation claims in Count III under the applicable *Mt. Healthy* framework and/or any relevant Title VII case law" and gave Plaintiff an opportunity to respond. *See id.* at 65-66 n.22. In her objections, Plaintiff does not challenge this determination.[1]

---

[1]In the Report and Recommendation, the Magistrate Judge stated that Defendants could not show they were entitled to qualified immunity because Defendants' initial summary judgment brief did not raise a qualified immunity defense. On supplemental briefing, Defendants did argue they were entitled to qualified immunity, but never showed that the individuals were acting within the scope of their discretionary authority when they fired Plaintiff. Therefore, the Magistrate Judge rejected Defendants' qualified immunity defense. *See* Report and Recommendation, at 53-55. No party has objected to this portion of the Report and Recommendation, and the court need not address it further as the court has

AO 72A
(Rev.8/82)

## II.     Discussion

The court has set forth in great detail the facts in this case as ably reviewed by the Magistrate Judge because the context in which Plaintiff was terminated is important to understanding why Plaintiff's objections to the Report and Recommendation fail.

Plaintiff's objections fall into four categories: (1) Plaintiff contends that the Magistrate Judge made credibility determinations in favor of Defendants.  Plaintiff, however, only gives one example of this – that is the Magistrate Judge's discussion of whether Defendants gave "false" responses to an interrogatory when they stated that Renee Windom and Jackie Holt complained to Council and the Mayor about Plaintiff's behavior. (2) Plaintiff argues that the Magistrate Judge looked only at each piece of evidence individually and did not consider the totality of the circumstances.  For example, Plaintiff argues that Defendants learned of Plaintiff's support for the Cline gender discrimination grievance when they received the Gray Report on September 14, 2004, and Plaintiff was fired less than one month later without ever having been warned about her job performance and supposedly based on events remote in time. (3) The Magistrate Judge improperly placed the burden of persuasion on Plaintiff to show that Defendants' legitimate non-discriminatory reasons for termination were pretextual.  (4) Plaintiff's complaints about the treatment of

_____

determined that Plaintiff's speech was not a matter of public concern.

Cline were raised as a citizen and not as an employee and therefore were entitled to First Amendment protection.

### A.   Credibility

Plaintiff asserts that the Magistrate Judge made a "credibility" determination in finding that Defendants had erred in placing Jackie Holt and Renee Windom's names on an interrogatory response to identify those employees who had complained about Plaintiff's behavior. Plaintiff, however, has not offered any evidence from which the Magistrate Judge could have made a choice about credibility. The only evidence in the record is that Defendants erred in placing those names on the interrogatory response. Plaintiff speculates that Defendants did this for nefarious purposes, but Plaintiff has no support for that conclusion. Furthermore, Holt and Windom's names were only two of eight employees identified in the interrogatory answer. There is no question that the other six employees did in fact complain about Plaintiff. Finally, while Holt did not complain to anyone, Windom complained to another employee – Mary Lynn Meadows – who may have passed the information along. In fact, in her deposition, Windom testified that Plaintiff was hostile and unapproachable because she was hateful. *See* Windom Depo., at 27-28. Accordingly, the Magistrate Judge did not make a "credibility" determination in reciting these facts, but rather reviewed the available evidence in the record. Plaintiff proffered no evidence from which a jury could believe that Defendants deliberately offered false responses to interrogatories.

17

**B.      Totality of the Circumstances**

A "plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"   *Jones v. U.S. Dep't of Veterans Affairs*, 213 Fed. Appx. 933, 935 (11th Cir. 2007) (unpublished opinion).  "To survive a motion for summary judgment, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" *Id.* at 935-36.

A "proffered reason is shown to be pretext for discrimination only when it is shown that the reason was false *and* that discrimination was the real reason." *Dawson v. Henry County Police Dep't*, 2007 WL 1893367 (11th Cir. July 3, 2007) (unpublished order) (emphasis in original); *see also Crawford v. City of Fairburn*, 482 F.3d 1305, 1308-09 (11th Cir. 2007) (plaintiff's claim of pretext fails where plaintiff fails to raise questions about the truthfulness of any proffered reasons for termination because "evidence of discriminatory animus" does not allow a plaintiff "to establish pretext without rebutting each of the proffered reasons of the employer").

Viewing the evidence in the totality, as the Magistrate Judge did, shows that no reasonable jury could conclude that Plaintiff was terminated based on her participation in

18

the Gray report or her own charges of discrimination.  Most significant is the fact that Cline, herself, was not terminated and did not suffer any other adverse employment action as a result of her complaints.  Furthermore, Lewis was terminated.  The only reasonable conclusion that can be drawn from these facts is that Council took the complaints about Lewis seriously and took action based on those complaints.

Plaintiff's job, ultimately, was under the supervision of political entities – the city manager and city council.  It is not unusual or suspicious that when Council discussed the management problems in the City's governance, starting with Lewis, Council also discussed the problems they had all become aware of with Plaintiff's behavior and attitude.  Plaintiff has adduced no evidence from which a jury could conclude that Council brought up the issue of Plaintiff's employment because of her participation in the Gray report.

In her objections, Plaintiff asserts that in *Daneshvar v. Graphic Tech., Inc.*, 18 F. Supp. 2d 1277, 1294 (D. Kan. 1998), a race and national origin employment discrimination case, the court held that the defendant's reliance on an incident four years old coupled with the plaintiff's other evidence of pretext precluded summary judgment, including comments by a decision-maker referring to plaintiff's national origin.  However, *Daneshvar* is distinguishable because there was other evidence of pretext in that case, which Plaintiff here does not have.  Furthermore, the plaintiff in *Daneshvar* had had a review three

19

months before and after not receiving a promotion where his performance was rated as exceeding company expectations.

Plaintiff points to testimony by one Council member that he suggested firing Plaintiff, Cline, and Bridges-Kee because they were part of a group "creating this environment." Plaintiff argues that each engaged in protected conduct. Council, however, did not terminate Cline and Bridges-Kee, and Plaintiff cannot show that even if Council member Alexander believed this, he was able to influence the other members of Council to act for this reason as well.

## C.    Pretext

Plaintiff points to a statement made by the Magistrate Judge in the Report and Recommendation as indicating that the Magistrate Judge applied the incorrect legal standard in analyzing Plaintiff's pretext claim. "[A]lso, the Court finds that the circumstances in this case prevent the Court from concluding that Defendants' reliance on remote incidents was pretext." *See* Report and Recommendation, at 41. Plaintiff contends that the Magistrate Judge "erroneously required Plaintiff to affirmatively disprove any possibility that Defendants were motivated by their proffered reasons." *See* Objections, at 11. As the court outlined above, it is not clear that these statements are inconsistent with Eleventh Circuit precedent in this area. Furthermore, the court disagrees that the Magistrate Judge's Report and Recommendation applied an incorrect legal standard. The plaintiff ultimately bears the

burden of persuasion on the issue of pretext.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

With respect to the Magistrate Judge's discussion of the Holt and Windom interrogatory response, the Magistrate Judge was not requiring Plaintiff to disprove Defendants' explanation.  As is commonly discussed in employment discrimination cases, an employer may take an action for a reason that turns out to be incorrect, so long as the employer reasonably believed at the time that it was correct.  Here, Plaintiff proffered no evidence to show that Defendants did not actually believe or reasonably believe that Holt and Windom had complained about Plaintiff.  "The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue."  *Dawson v. Henry County Police Dep't*, 2007 WL 1893367 (11th Cir. July 3, 2007) (unpublished order).  Furthermore, as the court explained above, Holt and Windom were not the only names listed in response to that interrogatory question.  Because six other individuals listed in the interrogatory actually did complain about Plaintiff, it makes the concern about Holt and Windom far less significant, particularly where there is no dispute that Windom actually did complain, albeit through the conduit of Mary Lynn Meadows, another employee.

   **D.    First Amendment**

21

The Eleventh Circuit has held that

> [f]or a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show by a preponderance of the evidence these things:
>> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.  Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that "it would have reached the same decision . . . even in the absence of the protected conduct."

*See*, *e.g.*, *Battle v. Board of Regents for Georgia*, 468 F.3d 755, 759-60 (11th Cir. 2006) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).  The court must "first ask 'whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'"  *Id.* at 760 (quoting *Garcetti v. Cebellos*, 126 S. Ct. 1951, 1958 (2006)).

Whether Plaintiff's "speech" is a matter of "public concern" is a question of law to be determined by analyzing the speech's "content, form, and context . . . as revealed by the whole record" to evaluate whether the purpose of the speech was to raise matters of public concern.  *See*, *e.g.*, *Gonzalez v. Lee County Housing Auth.*, 161 F.3d 1290, 1296-97 (11th

Cir. 1998).  Plaintiff bears the burden of proving that his speech addresses a matter of public concern.  *See Maples v. Martin*, 858 F.2d 1546, 1552 n.9 (11th Cir. 1988).

In *Gonzalez*, the plaintiff wrote a letter complaining about a wide variety of issues in her working environment and alleging that her supervisor also required her to discriminate against minorities and elderly applicants for public housing.  In order to determine whether plaintiff's letter satisfied the "public concern" factor of the *Pickering-Connick* test, the court analyzed the content, form, and context of the entire record to evaluate whether Gonzalez's purpose was "to raise issues of public concern . . . or to further her own private interest."  *Id.* at 1296-97.  Because the court found that most of plaintiff's letter "simply blames [her supervisor] for creating a poor working atmosphere," the court concluded that, in large part, the letter did not touch upon matters of public concern because "'the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.'"  *Id.* at 1297 (quoting *Connick*, 461 U.S. at 148-49).  Based on this analysis, the court concluded that even the portion of Gonzalez's letter that dealt with the discriminatory practices was written in order to "further her own private interest," rather than "to raise issues of public concern."  *Id.* at 1298.

Furthermore, while public dissemination is not dispositive on the issue of public concern, an "employee's attempt at public disclosure nonetheless remains a relevant factor in determining whether the speech was a matter of public concern."  *Morgan v. Ford*, 6 F.3d

750, 754 n.5 (11th Cir. 1993) (per curiam).  In *Morgan*, where an employee alleged a First Amendment violation for constructive discharge in retaliation for reporting sexual harassment, the court emphasized that the relevant determinative factor in the "public concern" test was not whether the topic of the speech might be one in which the public would have an interest, but rather the court had to determine whether the purpose of the speech was to raise matters of public concern, on the one hand, or to further the employee's own private interest on the other.  *Id.* at 754.  There, the court determined that because plaintiff's speech was in the form of complaints to internal groups, including her employer's Office of Fair Employment Practices, and because plaintiff did not attempt to involve the public in any manner, plaintiff's speech was "driven by her own entirely rational self-interest in improving the conditions of her employment."  *Id.* at 755.  *See also Stanley v. City of Dalton*, 219 F.3d 1280, 1288 n.13 (11th Cir. 2000) ("When there is a personal element to the speech, complaints of wrongdoing within a public agency may not constitute speech on a matter of public concern.").

Here, Plaintiff did not speak up of her own accord.  She was responding to questions from an outside counsel engaged to investigate another employee's complaints of discrimination.  Plaintiff's statements were made in a private forum where she was told they would not be disseminated further.  Further, her statements in the Gray report relate to her

24

own problems with Lewis' management style.  Plaintiff's involvement in the Gray report stemmed in part from her role as the head of Human Resources for the City.

Plaintiff avers that it was incorrect for the Magistrate Judge to determine that Plaintiff's speech was not a matter of public concern because she participated with Sears and Gray in "strategy" discussions.   Plaintiff contends that she did not initiate these conversations and believed they were highly inappropriate.  Plaintiff believed that Sears and Gray were attempting to influence her testimony when they stated in her presence that they did not believe Lewis' conduct was necessarily gender discrimination, but rather more likely it was poor management.

However, as noted above, Plaintiff's discussions with Sears and Gray were just one part of the total context that the Magistrate Judge considered in determining whether Plaintiff's speech was on a matter of public concern.  Further, whether Plaintiff found those discussions "highly inappropriate" or not does not change the context in which the Gray Report was generated.

Plaintiff also contends that she need not show that her reason for speaking was "totally altruistic," and the fact that she would benefit from Lewis' termination does not render her speech of a personal concern, citing *Rodin v. Coral Springs Volunteer Firefighters Ass'n*, 2007 WL 1217943 (11th Cir. April 26, 2007) (unpublished opinion).  In *Rodin*, the plaintiff was a volunteer firefighter in the city of Coral Springs, Florida.  The city

25

decided to convert its all-volunteer firefighter force to a semi-professional one staffed by both paid and volunteer firefighters. Rodin was the president of the Coral Springs Volunteer Firefighters Association and did not agree with certain aspects of the transition plan. On behalf of the association, the plaintiff met with various city government officials to discuss his concerns. During the meeting, Rodin criticized the fire chief's management of finances and his decision to close one of the fire stations, stating that it endangered public safety. He also stated that some of the volunteer firefighters had been harassed by the paid firefighters and that their equipment had been vandalized, endangering the volunteer firefighters. Two weeks after the meeting, the fire chief informed the plaintiff that he had been suspended indefinitely from the fire department. The plaintiff continued to speak out about these issues and eventually was terminated from the fire department.

The district court rejected the plaintiff's First Amendment claim finding that his speech was in the nature of an employee grievance and not a matter of public concern. The Court of Appeals reversed this determination stating that

> [s]peech addresses a matter of public concern when the speech can be 'fairly considered as relating to any matter of political, social, or other concern to the community.' 'Whether the plaintiff's speech addressed a matter of public concern depends upon the content, form and context of the statement considered in light of the entire record.'

*Id.* at *3. The court found that the plaintiff's discussion of the closure of the fire station directly related to matters of public concern and safety. Similarly, the allegations of

vandalism of fire equipment was also a matter of public concern, as were criticisms of a

public institution's funding decisions.  The court concluded that the plaintiff's statements

related only to the volunteer firefighters' situation did not alter that conclusion.  The "cases

make clear that the presence of purely private concerns alongside matters of public concern

is not dispositive of the public concern inquiry."  *Id.* at *4 (citing *Connick v. Myers*, 461

U.S. 138, 148 (1983)).  The court stated that the district court erred in concluding that the

plaintiff's motivation in speaking was because of self-interest.  The court noted that the

> public-minded character of Rodin's speech is reinforced by a number of facts
> about the context in which he spoke.  The speech was pertinent to a then-
> current public debate, as the fire department was in the process of changing
> from an all-volunteer to a semi-professional fire department.  This meant that
> Rodin had a realistic hope of changing fire policy by bringing his comments
> to these policymaking officials, and supports our conclusion that he was
> motivated at least in part by the public interest.  Moreover, Rodin was
> speaking not on his own behalf, but as a representative of the [volunteer
> firefighters' association], and was thus in a unique position to contribute to
> the ongoing debate over fire policy in Coral Springs.  We have previously
> found the representative character of a public employee's speech to be
> significant in the public concern inquiry.  *See Tindal v. Montgomery County
> Comm'n*, 32 F.3d 1535, 1540 (11th Cir. 1994) (holding that testimony
> regarding sexual harassment in sheriff's office involved matter of public
> concern, in part because employee was speaking on behalf of others who had
> been harassed, not on behalf of her own private claim).  *See also Anderson*,
> 239 F.3d at 1219 (matter of public concern in questionnaire circulated by head
> of emergency employees' union to political candidates).  That Rodin had a
> public motive is also supported by the fact that he was a volunteer firefighter,
> not a paid city employee. There is no evidence in the record that Rodin would
> have personally benefitted from any of the proposals he made on behalf of the
> [firefighters' association]. The context of Rodin's statements shows that they
> were motivated in significant part by the public interest:  specifically, a desire
> to improve the fire department.

27

*Id.* at *5.  The court also noted that it has never "held that speech must be motivated entirely by a public-minded purpose in order to receive First Amendment protection." *Id.*  The court further noted that public dissemination was not required to find that speech was a matter of public concern.  *Id.* at *6.

Again, Plaintiff is correct that she does not need to show that her speech was "entirely altruistic," but rather the court must review the total context of her speech.  Part of that total context is that Plaintiff had her own problems with Lewis' management style and discussed those in her interview for the Gray Report.  That factor, along with the others discussed by the Magistrate Judge and above, lead the court to conclude that Plaintiff's speech was private and not entitled to First Amendment protection under *Mt. Healthy*.  In fact, the distinctions between the facts in *Rodin* and the facts of Plaintiff's case provide further support for the position that Plaintiff's speech was private and not on a matter of public concern.  Rodin's speech was voluntarily made by Rodin at his own initiative.  It was made during a meeting with policymakers where Rodin hoped to influence what happened with respect to the policies of the fire department.  Rodin's position as a volunteer fireman demonstrated that he had nothing to gain from the ultimate decisions made.  Plaintiff's speech, in marked contrast, was not made at her behest or to ultimate decision-makers.  Plaintiff had similar problems with Lewis as a supervisor and thus would benefit from any investigation of Lewis.

28

Finally, even if Plaintiff's speech were considered public, Plaintiff did not offer any reason in her objections to the Report and Recommendation as to why the Magistrate Judge would have been incorrect to conclude that Plaintiff would not be able to establish causation on her First Amendment claim.  For the same reasons as Plaintiff could not establish pretext, she could not establish causation under the *Mt. Healthy* analysis.

For the foregoing reasons, the court ADOPTS the Report and Recommendation of the Magistrate Judge as the ORDER of this court.

## III.     Conclusion

The court GRANTS Defendants' motion for summary judgment [20-1] and ADOPTS the Report and Recommendation of Magistrate Judge Alan J. Baverman [59-1].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 18th day of September 2007.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

29